UNITED STATES DISTRICT COURT
For The
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:25-CV-10468-IT

TOMMY GIGUERE,
        Petitioner

v.

STACY TARDIF,
        Respondent

## PETITIONER'S AFFIDAVIT IN SUPPORT OF OPPOSITION TO RESPONDENT'S MOTION TO DISMISS

I, the undersigned, Tommy Giguere, of my own personal knowledge, on oath depose and state as follows:

1. I am married to the Respondent, Stacy Tardiff ("Stacy").

2. Stacy and I have two (2) children together, MG1 and MG2.

3. Stacy and I were both born in Saint-Georges, Quebec (QC), Canada.

4. On October 16, 2021, Stacy and I were married in Saint-Benoit-Labre, a city neighboring Saint-Georges, QC, Canada.

5. Our children were born in Saint-Georges, QC Canada on April XX, 2020 and April XX, 2022, respectively.

6. Since the beginning of our relationship, through the birth of our children and our marriage, Stacy and I have always lived in Vallée-Jonction, QC, Canada.

7. I worked with my father at Gravière Giguère, a family excavation company located in Vallée-Jonction, QC. My father and I had different points of view regarding the future of the business, but have worked well together and continue to work well together as I now working for him again.

8. Stacy previously worked with her parents at Transport Dercy, Inc. in Beauceville, QC.

9. Around July 2021, Stacy informed me of her parents' intention to launch a transport business in the United States.

10. Following this notification, Stacy and I had a lighthearted and hypothetical conversation about what it would be like to move to the United States temporarily to help launch the business with Stacy's parents.

11. I did not at the time and never did in the future have a goal, desire or plan to live permanently in the United States. Our family would talk about how it would be fun and convenient to be able to cross the border more easily for vacations, but we never had any intention to be American.

12. Stacy and I ultimately agreed to move to the United States temporarily and were excited about this new life experience that was, in our minds at the time, more akin to the excitement of going on a vacation to a new locale rather than a permanent move.

13. We decided to take part in launching the project and applied for a non-immigrant visa e2 in 2022, the maximum length of which is five (5) years, with mandatory renewal of the i94 admission numbers every two (2) years, forcing us to leave the US territory at the end of the two (2) years in order to renew the i94 admission numbers, should we wish to extend our stay.

14. As such, prior to our departure, Stacy and I agreed that the children and ourselves would return to Canada at the latest at the end of the five (5) year stay but that we would have a further discussion at the two year visa renewal time. However, it was also agreed upon that we would return to Canada sooner should one of us request it, for any reason whatsoever. Stacy now tries to position this agreement to return to Canada as being limited to whether

the business opportunity was successful or not, but our agreement always extended personal dissatisfaction with the temporary arrangement in the United States as well.

15. In addition to the clear agreement between Stacy and myself that our stay would be temporary, the issuance of ours and the children's visas were conditional on provision of proof of our intention to depart at the end of the duration we were legally authorized to stay.

16. On November 11, 2022, we entered the United States and obtained our i94 numbers, which were to expire on November 10, 2024.

17. We initially lived in Haverhill, Massachusetts in an apartment paid for by Stacy's parents. Stacy's parents agreed to cover this cost for a period of one year. Stacy's parents had a room in our apartment, from which they came and went as they wished, at times without any advance notice to myself or Stacy.

18. We retained our home in Canada and returned frequently to visit family and friends, often timing those meetups with business travel to minimize expense.

19. In January 2023, MG1 began attending daycare part-time, spending two days per week with me.

20. As soon as March 2023, I voiced my wish that the children, Stacy and I return to Canada as our living situation was making it impossible for me to remain in Massachusetts.

21. Stacy's parents lack of regard for myself and our family space in the apartment they provided (by imposing their presence and opinions), made me feel isolated.

22. Following discussion with Stacy, I accepted that we would remain in Massachusetts until the expiration of our i94 admission numbers in November 2024, conditional to us moving into an apartment over which her parents would have no rights and where they could not impose their presence.

23. Following multiple searches, we came to the conclusion that the apartment rental market was very high, making renting a financially bad decision.

24. Although our stay was only to be temporary, we decided to purchase a house in Salisbury, MA, as this would enable us to take advantage of an expected increase in the residential property market when the time would come to sell upon our return to Canada in November 2024.

25. In May 2023, we sold our house in Canada, as Stacy's parents soon would no longer cover our rent in Massachusetts, and we could not afford our mortgage in Canada and additional housing costs in Massachusetts at the same time.

26. Upon the sale of our house in Canada, we packed our belongings, had them shipped to the United States, and stored them in a shipping container in the business yard of Stacy's parents' business. The business covered the storage and shipping costs for us, and we reasoned that, whether we rented or purchased a home in Massachusetts, we wanted our belongings nearby to avoid having to purchase duplicate items. We still were not planning to be in Massachusetts for longer than a year, but needed our belongings in the interim, particularly given the financial strain of potential repurchase.

27. In speaking with friends, I acknowledged that there were positives to living in the United States, but I never said that I didn't want to return to Canada. In fact, I frequently noted that my friends and family in Canada were missing me, and I was missing them.

28. During our time in Massachusetts, we have developed few close relationships, with most of our contact related to work.

29. Although my car was registered in Massachusetts, this was done solely to avoid being ticketed as Stacy warned me would be the case if the police noticed that the car was there for

over a month. I continue to maintain my driver's license in Canada and motorcycle registration in Canada. Stacy has maintained her Canadian driver's license as well.

30. We are registered to vote in Canada and, as recently as this week, received our voter ballots for the upcoming election.

31. Stacy and I enrolled MG1 in Milestones Childcare on August 4, 2024, before Stacy filed for divorce, because her prior daycare was no longer available and I recognized that MG1 would need childcare between August and November 2024 when we returned to Canada.

32. On February 12, 2024, Stacy and I got into an explosive conflict with Stacy's parents. Stacy's mother told us that she had control over our income, our presence in the United States, and that we belong to her. Stacy was crying and stated that she was ready to come back to Canada as her mother's behavior was unacceptable.

33. In March 2024, Stacy and I traveled with the children to Canada to spend time with my family. On the drive back from Canada, Stacy and I discussed my desire to return to Canada. I had spoken to my father about our return to Canada after the fight with Stacy's mother. My father reiterated that I could join him in the family business and ultimately take it over, but I made clear that was not my intention, though I appreciated his offer.

34. The plan I proposed with respect to returning to Canda had been that Stacy would work remotely for her parents' business. She would have the ability to continue to work for her parents' business while we lived in Canada. We had agreed to help start her parents' business, but we were not owners and there had been no concrete plan about purchasing it or having it transferred to us by her parents and her uncle. I had planned to return to Canada to start my own business and to be closer to family. What Stacy characterizes as our joint plan to remain in Massachusetts is simply untrue.

35. Further, Stacy seems to suggest that because the business was experiencing success that was a reason to stay beyond the timeframe to which we had committed. What Stacy does not underscore is that the business was not ours and, notwithstanding any purported success of the business, Stacy and I were struggling to pay our bills each month such that remaining in Massachusetts would not be financially sustainable for us.

36. We had further discussions about our return to Canada in August 2024. Stacy suggested that I take a week for myself to go to Canada and see if my business venture would be viable. She wanted to stay in Massachusetts and have me travel back and forth from Canada to Massachusetts to spend time with the family on weekends. I was not in agreement with this proposal. It did not make sense to me, particularly where there was more opportunity for our family in Canada where the cost of living is lower, we have the support of extended family and friends, we have the ability to receive government support to help defray child-related expenses, and we have permanent status as Canadian citizens (as opposed to temporary visas in the United States without any guarantee of being able to live there permanently, even if we wanted to, which I did not).

37. On August 20, 2024, I left our house in Massachusetts with the intent to come back and honor the agreement Stacy and I had reached about remaining in Massachusetts until November 2024. When I left, I took my house key with me but left her all the business-related items as I would not need them in Canada. Though I was planning to return to Massachusetts, I did want to actively plan for our return to Canada in the next few months and thus took some personal items with me as well.

38. On August 23, 2024, without any advance notice to me, Stacy withdrew approximately $10,000 from our joint account in Canada and deposited it into her personal Canadian bank

account. This action on Stacy's part indicated to me that our partnership was ending, and I needed to take more affirmative steps to ensure the children's return to Canada.

39. The following day, August 24, 2024, Stacy relayed to me a phone call she received from a member of my family about Stacy and me divorcing. I let Stacy know that some people had asked why I was in Canada without our family, and I shared that we were having some issues. I did not mention divorce to my family, but miscommunication in repeating the conversation appeared to have resulted in Stacy getting the wrong message.

40. When I returned to our house in Massachusetts on August 26, 2024, Stacy had packed my belongings and left them in the garage. Though there was evident tension between me and Stacy, I was anxious to see and spend time with our children.

41. That evening, I asked Stacy about the funds she withdrew from our joint account. Her response was that it was her money and there was nothing to argue about. When I left Massachusetts on August 27, 2024, Stacy was to return to Canada with the children on Friday, August 30, 2024 for the weekend. Stacy called me on August 28, 2024 to advise me she would not be honoring that plan.

42. I have consistently shared my desire for us to return to Canada, as was our plan from the outset. I shared with Stacy, as one example, that I didn't want to wait until my parents are in poor health to return but instead to return now while we can enjoy this time with family. Stacy has now spun this to say that I lied about my parents' health, which is not the case.

43. Stacy has also resorted to fabricating allegations of alcoholism. I have never had an issue with drinking. I drink beer on occasion and very rarely drink wine or spirits. This purported concern was not raised previously, and, in fact, Stacy had no problem with my parenting the children independently, driving with them to Canada, and spending overnights with them nor did she take issue with my driving the commercial vehicle for her parents' business. I

worry that Stacy is willing to say anything to keep the girls in Massachusetts and away from me.

Signed under the pains and penalties of perjury this 4ᵗʰ day of April, 2025.

*Tommy Giguere*

ID 3QCDRR/D9x3pthUG82CWQ1ox

Tommy Giguere

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Petitioner's Affidavit in Support of Opposition to Motion to Dismiss was electronically served on counsel for the respondent, Stacy Tardiff, at his email of record being brian@turcolegal.com on this 7ᵗʰ day of April, 2025.

*Wendy O. Hickey*

## eSignature Details

| | |
|---|---|
| **Signer ID:** | **3QCDRRfD9x3pthUG82CWQ1ox** |
| Signed by: | Tommy Giguere |
| Sent to email: | tommgiguere1991@gmail.com |
| IP Address: | 207.134.122.26 |
| Signed at: | Apr 4 2025, 1:25 pm EDT |