UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TOMMY GIGUÈRE, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | Civil Action No. 1:25-cv-10468-IT |
| | * | |
| STACEY TARDIF, | * | |
| | * | |
| Respondent. | * | |
| | * | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

August 26, 2025

TALWANI, D.J.

On February 26, 2025, Petitioner Tommy Giguère filed a <u>Verified Complaint for Return of Minor Children to Canada Pursuant to the Applicable Hague Convention</u> [Doc. No. 1] against Respondent Stacy Tardif pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–11, which implements the Hague Convention. Petitioner seeks the return of the parties' two minor children (the "Children") to Quebec, Canada, asserting that Respondent wrongfully retained them in Massachusetts on August 28, 2024. Following limited discovery, the court held a three-day evidentiary hearing on July 16, 17, and 24, 2025, with closing arguments on July 29, 2025. To correct an evidentiary ruling, the court permitted supplementation of the record by the parties' affidavits, limited to the content of private oral conversations between them. <u>See</u> Mem. & Order [Doc. No. 46]; Am. Aff. of Stacy Tardif ("Respondent Aff.") [Doc. No. 53]; Aff. of Tommy Giguère ("Petitioner Aff.") [Doc. No. 49]; <u>see also</u> Elec. Order [Doc. No. 55] (striking affidavits in part).

The court's findings of fact and conclusions of law are set forth below.

## I.    Findings of Fact

### A.    The Parents and Their Young Children are Canadian and Originally Resided in Canada

Petitioner and Respondent are the father and mother of two minor children, MG1 and MG2, for whom both parties cared and exercised custodial rights. Stipulation of Uncontested Facts ("Stip.") ¶¶ 1–2, 12 [Doc. No. 33]. Both Petitioner and Respondent were born in Canada. Id. ¶¶ 3, 6. They married in Quebec in October 2021. Id. ¶ 7. MG1 and MG2 were born in Quebec in April 2020 and April 2022, respectively. Id. ¶ 9. Petitioner, Respondent, and the Children are all Canadian citizens with Canadian passports. Id. ¶ 11.

Petitioner and Respondent owned a home in Quebec, which they lived in prior to December 27, 2022. Id. ¶ 16. Petitioner and Respondent are registered to vote in Canada. Id. ¶¶ 34, 43. To this day, Petitioner maintains his driver's license and motorcycle registration in Canada. Id. ¶ 32. Respondent maintained her Canadian driver's license prior to Petitioner filing the pending petition. Id. ¶ 33.

Petitioner's parents, brother, sister, sister's family, aunts, uncles, cousins, and lifelong friends live in Quebec.[1] Respondent's brother, grandparents, aunts, uncles, and cousins live in Quebec. The Children's cousins and family friends live in Quebec.

Respondent's parents are Canadian citizens who own a home in Quebec. They spend a third of the year in Quebec.

---

[1] Factual findings without citations are based on testimony at the evidentiary hearing.

Respondent's parents own a transportation business, Transport Dercy Inc. ("Dercy"), in Quebec, Canada. Id. ¶ 17. Prior to December 27, 2022, Respondent worked for various employers in Canada, including Dercy. Id. ¶ 15.

Petitioner worked with his father at an excavation company until August 2021. Id. ¶ 13. After he left his father's employ in August 2021, Petitioner went to work as a truck driver and mechanic for Dercy in Canada. Id. ¶ 14.

Respondent's younger brother, Derreck Tardif, has worked as an operation manager for Dercy in Canada since approximately 2019. Derrick Tardif and Respondent had a plan that they would take over their parents' company one day. These conversations began over five years ago—prior to the birth of the Children and prior to Dercy starting a business in the United States.

**B.    In 2022, Respondents' Parents Opened Dercy's U.S. Operations and Rented an Apartment in Haverhill, Massachusetts**

In 2021, while cloistered in Florida due to Covid, Respondent's father, Michel Tardif, began the process of starting a U.S. business. Michel Tardif started working in Massachusetts in 2022.

On November 4, 2022, Respondent's father and mother signed a one-year lease for an apartment in Haverhill. Hr'g Ex. 2.

**C.    In 2022, Petitioner and Respondent Offer to Help with Dercy's U.S. Business and Obtain Non-Immigrant Visas**

Michel Tardif did not initially include Petitioner and Respondent in the visa process for the company. Respondent and Petitioner expressed interest in being part of that business sometime in 2022.[2]

---

[2] The court rejects Respondent's claim that she and Petitioner decided to offer to help her parents in the United States in July 2021. First, Respondent acknowledged that they made that decision
(Continued on next page.)

Michel Tardif subsequently initiated the process to acquire E-2 non-immigrant visas for Respondent to be able to work for him in the United States.[3] Respondent, as the primary applicant for the E-2 visa, worked with an immigration attorney to establish her work, knowledge, and what she could do and provide to the company that another employee could not. Petitioner and the Children were Respondent's dependents for purposes of the visa. Petitioner did not interact with the immigration attorney.

As part of the visa application, Respondent attested on May 25, 2022: "I intend to return to Canada upon completion of my authorized temporary period of stay under an E-2 Visa." Hr'g Ex. 4.

On November 10, 2022, Petitioner, Respondent, and their Children were granted E-2 visas. The E-2 visa is valid for up to five years and may be extended further. Stip. ¶ 21 [Doc. No. 33]. To date, their legal status in the United States is only as non-immigrants.

---

about a week <u>after</u> her parents told them that they had opened the business, which as noted above was in 2022.

Second, Respondent testified that in preparation for the move, she enrolled their Children in daycare. But MG2 was not born until April 2022, so it seems unlikely that Respondent was inquiring about daycare for MG2 in July 2021, nine months before she was born.

Finally, Respondent testified that, in preparation for the move to the United States to work for Dercy, she sent a June 2021 letter cancelling the Canadian educational account for MG1. <u>See</u> Hr'g Ex. 127. The letter states: "We know there will be fees, but since we are planning to move to the United States, we have no other choice." <u>Id.</u> at 127.002. In June 2021, however, Petitioner was still working for his father, the couple was not yet married, and Michel Tardif had not yet started the U.S. business. Where there is no other evidence in the record of a plan to move to the United States in 2021, the court finds that the claim "we are planning to move to the United States" may have reflected her long-term desire to move, but not a then-present plan.

[3] The E-2 visa is a nonimmigrant classification for a foreign national (1) "when investing a substantial amount of capital in a U.S. business," which requires a showing of at least 50% ownership of the enterprise; or (2) who is a qualifying employee of such a person or organization. USCIS, <u>E-2 Treaty Investors</u>, https://www.uscis.gov/working-in-the-united-states/temporary-workers/e-2-treaty-investors. The E-2 visa is valid for up to five years with the possibility of further extension. Stip. ¶ 21 [Doc. No. 33].

Petitioner and Respondent entered the United States on November 11, 2022, to obtain I-94 numbers in connections with their E-2 non-immigrant visas. Stip. ¶¶ 20–21 [Doc. No. 33].[4] The I-94 numbers require renewal every two years, and Petitioner, Respondent, and the Children's original I-94 numbers were set to expire on November 10, 2024. Id. ¶¶ 21, 23.

### D.    Petitioner and Respondent Shared a Plan to Move to the United States on a Trial Basis When They Left Canada in Late December 2022

Petitioner explained to his family and friends that moving to Massachusetts would be a good experience, a "trial," to help the launch of the business. Petitioner's sister recalled both parties telling her that they would try living in Massachusetts to see if the business would work and if they would be happy. Petitioner's friend, Melanie, recalled him saying that he wanted to start a company in the United States and see if it would work out. The parties' mutual friend, Erika, also recalled them saying they were moving to the United States for a long-term project to start a new company.

Both parties testified that their move to the United States was for a trial period to see if the business was successful and if they liked it or not. They "told each other [they] would try it and if [they] didn't like Massachusetts or if the business wasn't successful, [they] would go back[.]" Respondent Aff. ¶ 11 [Doc. No. 53]; see also id. ¶¶ 5–6.

They packed only what they needed for the first week, leaving their furniture, mattresses, and other belongings in their home in Canada. As Respondent acknowledged, they did not sell their home at that time because they wanted to have a plan if they wanted to go back.

---

[4] The Form I-94 is the Department of Homeland Security's arrival/departure record for certain non-citizens. See U.S. Customs and Border Protection, I-94 Automation Fact Sheet, https://www.cbp.gov/sites/default/files/assets/documents/2021-Jul/I-94_Automation_Fact_Sheet_Jul2021.pdf (July 2021).

The parties moved with their Children to Haverhill, MA, on December 27, 2022, when MG1 was 2½ years old and MG2 was 6 months old. Stip. ¶¶ 9, 26–27 [Doc. No. 33]. They moved into the apartment Respondent's parents had rented. See id. ¶ 27.

The parties agreed to stay in this apartment initially because "if for whatever reason, [they] had to return, it would be easier to not have anything of [their] own to take care of putting up for lease or sale." Respondent Aff. ¶ 14 [Doc. No. 53].

E.    **Respondent and Her Parents Limited Petitioner's U.S Integration**

On January 19, 2023, Respondent was added to the Haverhill lease as a resident and authorized occupant, but the Children and Petitioner were not, even though the lease specifically stated that other occupants were only permitted for fourteen cumulative nights per calendar year. Hr'g Ex. 2.2 ¶ 1.[5] Petitioner was not provided his own set of keys.

Respondent's parents had keys to the apartment, Stip. ¶ 30 [Doc. No. 33], and occupied the primary bedroom with its separate bathroom. When they were in Massachusetts, they stayed in the apartment. In 2023, they were in Massachusetts every two weeks for 2-3 days at a time.

Respondent determined Petitioner's work assignments for Dercy. Petitioner expected to drive the work truck locally and do mechanic work without having to spend nights away from home. In the first year, Respondent instead sent Petitioner back a few days a week to Quebec, or to a steel shop in New Hampshire, because there was not enough work for him to do in Massachusetts.

---

[5] Although the rent may well have been paid by Respondent's parents' business, see Stip. ¶ 27 [Doc. No. 33], contrary to the parties' stipulation that Dercy leased the apartment, see id., Respondent's parents (and eventually Respondent), and not Dercy, were the signatories to the lease, see Hr'g Ex. 2.10.

When Petitioner did work in Massachusetts, he was paid in a joint bank account Respondent had opened for them in Massachusetts. When he worked in Canada, he was paid in the parties' joint bank account in Canada. Dercy did not pay for Petitioner to have health insurance in the United States.

Petitioner's interactions in English were generally limited to basic conversations or taking orders at restaurants; Respondent handled official communications for the family.

### F.    The Parties Had Different Motivations When They Sold Their Quebec House in May 2023

In May 2023, the parties sold their home in Canada. Stip ¶ 35 [Doc. No. 33]. They did so with different motivations.

Petitioner did not like sharing the apartment with Respondent's parents. He told his sister that Respondent's parents were always there, always invading their space, and that Respondent's mother was careless with their belongings. For Petitioner, the family needed to live elsewhere to solve problems arising from sharing an apartment with Respondent's parents. They could not afford to maintain both their home in Canada and pay apartment rental costs in the United States. Id. ¶ 31. Petitioner looked at rental options in Massachusetts but was deterred by the cost. He had always owned his own house and did not like the idea of renting; his father told him that rent is spoiled money whereas a house is an investment. He concluded that "it would be a better option to buy a house, even if it's only for a temporary period. In [a] discussion [with Respondent], [he] agreed that [they] should remain in the [United States] until November 2024." Petitioner Aff. ¶ 1 [Doc. No. 49].

Petitioner also wanted a single-story house, and the home they sold in Canada was two stories. See also Hr'g Ex. 38 (text message from Respondent to Petitioner's sister saying "[i]f we ever come back, we'll probably rebuild something smaller, single-story . . .").

Respondent claims they decided to sell the house because they "enjoyed [their] new life in the United States and didn't need a longer trial period." Respondent Aff. ¶ 16 [Doc. No. 53]. She testified along the same lines that the sale of the house in Canada meant that they enjoyed life in the United States and had decided to move because they knew they were not going back. The court finds that this describes Respondent's motivations only and does not reflect Petitioner's views or any actual agreement between the parties.

After the sale of the home in Canada, the family's furniture and personal belongings were packed into a shipping container, which was stored at the Dercy business yard in Salisbury, MA. Stip. ¶¶ 36–37 [Doc. No. 33].

The family continued to reside in Respondent's parents' apartment until September 2023. The parties had many neighbors in the six-story building, but did not make friends with those neighbors. While they lived there, MG1 played with random children she saw in common spaces, but did not make friends with them.

## G. The Parties Bought a Condominium in Salisbury, Massachusetts, as a Short-Term Residence

In September 2023, the parties bought a condominium in Salisbury. Stip. ¶ 40 [Doc. No. 33]. It was not the ideal house for either of them. For Petitioner, it was not single-story, but three stories tall, and did not have a large garage. And within a few months of Petitioner, Respondent, and the Children moving there, Respondent's parents moved into a unit two or three doors down that they had purchased in August 2023. Based on a $20,000 increase in the price of a neighboring property at the time and the condominium's location close to the beach, Petitioner thought that the condominium's value would increase quickly. He did not have a specific plan for earning a profit from the condominium and had not run the numbers in advance, but believed the property would increase by about $20,000 per year.

For Respondent, sometime after this purchase, they "were already discussing [their] next move"; "[they] wanted to move into a house with land . . . instead of in a Townhouse[.]" Respondent Aff. ¶ 31 [Doc. No. 53].

The parties listed themselves as non-immigrant aliens on their mortgage application. Stip. ¶ 41 [Doc. No. 33]. This statement is consistent both with their immigration status and with Petitioner's view that their time in the United States was still a trial period. Respondent's mother provided $45,000 to cover a gap in the parties' down payment. The money was described as a gift, because a loan could not be used to finance the house.[6]

 The parties' belongings were removed from the shipping container and moved into the condominium. Id. ¶ 42.

### H.    March 2024: Petitioner Makes Clear That He Does Not Want to Stay Past November 2024

In March 2024, Petitioner expressed to Respondent his unhappiness and his desire that the family return to Canada by November 2024. He told her he wanted to start a new business in Canada with the help of his father, and the parties discussed plans to make it work. Petitioner Aff. ¶ 2 [Doc. No. 49]; Respondent Aff. ¶¶ 36–45 [Doc. No. 53]. Respondent stated that it was still possible to return to Canada but that she did not want to leave everything behind unless she was certain that that was what he really wanted. Respondent Aff. ¶ 40 [Doc. No. 53]. Respondent asked if Petitioner might change his mind if he enjoyed the summer; he responded "that this was

---

[6] Respondent memorialized the gift of $45,000 towards the financing of the property in a Request for Verification of Gift (Gift Letter) that she and her mother signed. Hr'g Ex. 5. In a financial statement later provided to the Massachusetts Probate and Family Court, Respondent listed that $45,000 as a debt to her mother. Hr'g Ex. 6.3. Whether the $45,000 was a gift or a loan is not probative of the issues directly before the court, but the contradictory filings do suggest a lack of candor on legal documents.

unlikely, but that [they] could revisit the conversation closer to November 2024." Petitioner Aff. ¶ 2 [Doc. No. 49].

"Over the next few months, [Respondent] regularly raised the topic with [Petitioner] of staying in Massachusetts longer than November. Each time [he] told her [he] had not changed [his] mind and wanted [them] to return when [their] I94 numbers expired." Id. ¶ 3.[7]

## I.    Respondent Takes Steps to Give Up the Family's Canadian Residence and Obtain U.S. Residence

### 1.    Residence for Tax Filing

Also in March 2024, Petitioner and Respondent completed paperwork to be filed with the Canadian government to determine their residency status for tax year 2023. Either Respondent or her accountant filled out a draft NR73 form in Petitioner's name, and Petitioner subsequently sat down with Respondent to make corrections to the typed draft. See Hr'g Ex. 45A (original French); Ex. 45B (translation). After they handwrote modifications together, Petitioner signed the form and returned it to Respondent to be submitted. The differences between the marked-up version and the version that Respondent (or the accountant she was working with) ultimately submitted are significant:

- In response to the question, "How long do you expect to live outside Canada?" the parties handwrote: "2-5 [years.]" Hr'g Exs. 45A.2, 45B.2. The box for "I am leaving or have left Canada permanently and do not plan to return" is not checked. Id.

---

[7] The court does not find credible Respondent's claim that the parties "had agreed that [they] would renew [their] I-94's when the time would come . . . by the end of October or beginning of November[.]" Respondent Aff. ¶ 51 [Doc. No. 53].

- In the fully-typed version that Respondent or the accountant submitted, the 2-5 years handwritten limitation is missing and the "I am leaving or have left Canada permanently and do not plan to return" box is checked. Hr'g Ex. 109.002.

- In the marked-up version, the box is checked for "I usually live in Canada but I am leaving or have left Canada permanently," but the word "permanently" is crossed out. Hr'g Exs. 45A.2, 45B.2.

  - In the fully-typed version, the same box is checked and the word "permanently" is not crossed out. Hr'g Ex. 109.002.

- In the marked-up version, "visa obligation" is handwritten next to a question regarding expected return. Hr'g Exs. 45A.4, 45B.4.

  - In the fully-typed version, this note is omitted. Hr'g Ex. 109.004.[8]

- In the marked-up version, the question, "Do you intend to return to Canada to live?" is answered "Yes." Hr'g Exs. 45A.6, 45B.6.

  - In the fully-typed version, the response is "No." Hr'g Ex. 109.006.

- In the marked-up version, under a section titled "Ties with Canada," the following items are checked: "I will keep vehicles in Canada that are registered in a province or territory in Canada. . . . I will keep my driver's license from a province or territory in Canada. . . . I will have a guaranteed job available upon my return to Canada." Hr'g Exs. 45A.5, 45B.5.

  - The fully-typed version has none of these checked. Hr'g Ex. 109.005.

---

[8] A similar handwritten note—"Obligation of Return, 5-year Visa" in regard to long-term plans—was rewritten in the fully-typed version as: "However, we will have to come back after 5 years (duration of the work permit to apply again)." Compare Hr'g Ex. 45B.6, with Ex. 109.006.

- In the marked-up version, the box is checked for: "I will have subscriptions for life insurance or general insurance (including health insurance) through a Canadian insurance company." Hr'g Exs. 45A.6, 45B.6.

  o The fully-typed version has the box unchecked. Hr'g Ex. 109.006.

The parties dispute whether Petitioner signed the fully-typed version. The court finds Petitioner's testimony that he only signed the marked-up version more credible. Accordingly, the court treats the marked-up version, and not the fully-typed version, as representing Petitioner's intentions and state of mind in March 2024, and the fully-typed version as the form that Respondent nonetheless submitted on his behalf.

The answers in the NR73 form Respondent signed on her own behalf are nearly identical to the fully-typed version of the NR73 submitted on Petitioner's behalf. See Hr'g Ex. 119A (original French); Hr'g Ex. 119B (translation). The Canada Revenue Agency later sent Respondent a letter determining that she was a non-resident of Canada as of May 12, 2023, because she "ha[d] not maintained significant residential ties with Canada." Hr'g Ex. 123A (original French); Ex. 123B (translation).

### 2. Vehicle Registration

In April 2024, Respondent encouraged Petitioner to register his car in Massachusetts. She states that she did so because she had just learned that it was mandatory, see Respondent Aff. ¶ 48 [Doc. No. 53], but the court notes that she only raised the issue after submitting the tax forms that left the box for vehicle registration in Canada unchecked.

### 3. Green Card Application

Respondent testified that an attorney submitted a green card application in July 2024, and that the application covered Respondent, Petitioner, and the Children. No evidence of that application is in the record. Respondent's testimony contradicts the parties' stipulation that

"[Respondent] has not applied for any change in her or the Children's immigration status within the United States." Stip. ¶ 25 [Doc. No. 33]. When questioned about this inconsistency on cross-examination, she testified that the family had been on the wait list since July and she had not applied for anything <u>further</u> since Petitioner moved back to Canada.

In December 2024 (after divorce proceedings between the parties had commenced), Petitioner sent text messages to Respondent asking about the green card application:

> [Y]our lawyer told mine that you have already applied for a Green Card and that the girls and I would be included in the application. I need clarification on this. Also, if such an application is in progress, I ask you to provide me with all the information, file changes, and documentation . . . . Because your lawyer reportedly said there were green card applications, and if the girls or I are listed on the document, I have the right to know. . . . I'll clarify the question because my main question wasn't answered yesterday: Have any steps, whatsoever, been taken or planned after November 2022 to change the e2 nonimmigrant status of [the Children] and/or me to any immigrant status? Because, based on what I've learned recently, I have reason to believe that such steps may have been taken without my knowledge, and since I have legal custody of the girls and it's me, you must keep me informed of this.

Hr'g Ex. 41. Respondent testified that she did not directly answer his questions because she did not think it was really relevant.

The record does not show that a green card application for Petitioner, Respondent, or the Children has in fact been submitted to the United States. The court credits Respondent's testimony that she tried to start the process of obtaining a green card for Respondent, Petitioner, and the Children in July 2024, but concludes in light of her lack of candor about having done so, that she did so without Petitioner's knowledge. Respondent's testimony that Petitioner knew that Respondent had sought to start that process for him and the Children in July 2024 is not credible.

### J.    The Family Maintained Their Ties in Canada while Developing Some Relationships in the United States

Between December 2022 and August 2024, the parties primarily spent their weekends alone with their Children, visiting Quebec, or in Massachusetts hosting friends or family from

13

Quebec. They have returned to Quebec for most major holidays. On average, they returned to Quebec about once every three weeks. They also invited family and friends to their condominium in Massachusetts.

In January 2023, the Children were enrolled at a daycare that had four other children. MG2 was enrolled full-time, but for the first two months MG1 was only enrolled three days a week; when she was not in daycare, MG1 would be in the truck with Petitioner while he worked. Neither the daycare director, nor the other children, spoke French. The Children adapted to English, and the daycare director observed no issues with their integration. They can now converse in English and still speak French with Petitioner.

The Children continued at the daycare after the family moved to Salisbury in September 2023, where no other children lived in the neighborhood. The daycare director recalled the family attending three events a year with her and other families from the daycare, including going trick-or-treating with her family in 2023. The Children attended anywhere between 1–2 and 4–5 birthday parties between August 2023 and August 2024.

Respondent made friends, drawn from the other parents of the two or three other children at the Children's daycare. She went to dinner alone with them on some occasions. See, e.g., Hr'g Ex. 113; Respondent Aff. ¶ 20 [Doc. No. 53]. Petitioner did not often go out to socialize while in Massachusetts. Petitioner did not make close friends in the United States.

The Children were required to have health insurance in Massachusetts for their daycare, and were enrolled in February 2023, while still maintaining their health insurance in Quebec. The Children attended a medical examination in Massachusetts as required for daycare enrollment. They also each visited a Massachusetts pediatrician five to six times starting from April 2024. See Hr'g Exs. 107–108 (listing appointments through January 2025). They saw a

doctor in Quebec only once during their time in the United States, in November 2023, for a follow-up dose of a vaccination first received in Quebec. The Children's health insurance in Canada is still active. See Hr'g Exs. 15, 16.

The Children did not acquire public library cards in Massachusetts during this time.

In early August 2024, Respondent told Petitioner that the daycare no longer had space for MG2 and they would need to enroll her in a pre-school, and Petitioner agreed that she would be enrolled in the preschool until November. Petitioner Aff. ¶ 4 [Doc. No. 49].[9] On August 4, 2024, the parties registered MG1 for preschool. Stip. ¶ 46 [Doc. No. 33]; Respondent Aff. ¶ 71 [Doc. No. 53].

### K.    Mid-August to Early September 2024: Petitioner Insists that the Family Move Back to Canada and Respondent Insists that She and the Children Will Stay in the United States

On August 18 or 19, 2024, when Petitioner again told Respondent that he missed his family and friends and wanted to move back to Canada, Respondent asked him to write a letter to her. He wrote and gave her that letter, which she took to her parents' house to read; she did not return home until he put the Children to sleep. The letter began:

> I want you to know first of all that the most important thing for me is that we remain our little united family. I still love the woman I invited to the rock café almost 7 years ago. However, life here really doesn't suit me as much as I would have thought before we were here, it's not the first time I've talked about it, and every time we've talked about it, the thing that always made me keep trying to keep getting used to it was that you always told me that if one day things really didn't go well you would understand and that you would be happy anywhere as long as the 4 of us stayed together[.]

---

[9] The daycare director testified that MG1 moved from her daycare because it was time for her to attend preschool. There is no evidence in the record that Respondent relayed this to Petitioner (rather than claiming that there was not room at the daycare). The record is thus silent as to whether Petitioner would have agreed to move MG1's school for just a few months if he knew they had a choice to stay at the daycare.

Hr'g Ex. 32.1. The letter goes on to identify several reasons for wanting to return to Quebec, including: missing family and friends, finding "that working together is killing our relationship," the "[n]eed for independence, even if your parents are mostly easy to live with," and Respondent's "mother's attitude towards [Petitioner]." Id. The letter also states: "Even though I was really motivated when we talked about moving to the USA, the fact that you always told me that a return would always be possible if it didn't work out the way we wanted was always one of the most important things for me because it was still a test." Id. at 32.2. Petitioner explained at the end that "I promise you to continue to try to be better with time because the only thing that really keeps me here is what is most important to me, the 3 women in my life!!" Id. at 32.3.

Petitioner testified that after Respondent read the letter, the parties decided that he would go to Quebec for a week to see people and to try to convince Respondent to change her mind about returning to Quebec. Respondent testified that the purpose of that trip was to see if Petitioner could start a machinery hauling business, and to check with his father if his business plan was viable.[10] See also Respondent Aff. ¶ 57 [Doc. No. 53] (same).

On Tuesday, August 20, Petitioner departed for Canada. Stip. ¶ 47 [Doc. No. 33]; Hr'g Ex. 1.117 (Petitioner's I-94 record). Respondent would later claim that there was "an irretrievable breakdown of the marriage" as of August 20, 2024. See Hr'g Ex. 100.

In addition to job planning, Petitioner confirmed an available spot for MG1 at a Quebec preschool and inquired into cost. He also confirmed with his friend Melanie, who runs a foster home and has experience as a daycare teacher, that she had availability to take care of MG2.

---

[10] Petitioner's fallback plan was to return to working with his father, which he is doing now. Petitioner testified that Respondent could continue to work for Dercy remotely if they returned to Canada, and the only parts she could not do remotely would be conducting job interviews, driving, and helping in the yard.

Melanie had spaces available for both Children. Petitioner believed that the family would return in November 2024, which was when their I-94 numbers expired, Stip. ¶ 23 [Doc. No. 33], and he expected that during the three-month interim they would sell the Salisbury condominium and buy a new home in Quebec.

MG2 joined Petitioner on Friday, August 23. Hr'g Ex. 1.123 (MG2's I-94 record). On August 23, Petitioner also discovered a withdrawal of $10,056.32 from the parties' joint Canadian bank account. This amount was the entirety of their savings and investment account. Hr'g Ex. 29 (August account statement). That money was transferred to an account in Respondent's name and not returned to the joint account. Cf. Hr'g Ex. 30 (September account statement). Petitioner understood Respondent taking the money from their joint account to mean that Respondent was not coming back to Canada.

On August 24, after receiving a phone call from one of Petitioner's family members, Respondent called Petitioner and "asked him why he had told his family [they] were getting divorce without talking to [her] about it first." Respondent Aff. ¶¶ 75–76 [Doc. No. 53]. At the time, Respondent was unaware that Petitioner knew about the money being withdrawn and Petitioner did not tell her he knew. Instead, he "just told [her] that he had changed his mind. He was coming back on Monday the 26th and was going to pack and leave." Id. ¶¶ 58, 77.

On August 26, he returned with MG2 to Massachusetts. Stip. ¶ 49. He brought a trailer with him to move his belongings and work tools. His father came to help with the packing. Petitioner had mentioned to his father seeking mediation with Respondent, but not divorce.

While at the house and after the children had gone to sleep, he "confronted [Respondent] about a $10,000 withdrawal she had made from [their] joint back account in Quebec. She stated it was her money, that she was within her rights to take it, and refused to discuss it further. . . ."

Petitioner Aff. ¶ 5 [Doc. No. 49]. Petitioner also told Respondent that he needed to go back to Canada because of his parents' health conditions, which came as a surprise to Respondent because this had never come up before. Respondent Aff. ¶¶ 83–86 [Doc. No. 53]. Petitioner offered to help Respondent with the mortgage and daycare payments but Respondent told Petitioner that, because she knew he was leaving, she had already paid the mortgage and the daycare for a month in advance. Id. ¶ 92.

The parties had previously planned for Respondent and the Children to join Petitioner on Labor Day Weekend starting on August 30, 2024. Stip. ¶ 48 [Doc. No. 33]. They had planned to attend a big truck show or festival for people in the trucking business that they had also attended the year before. Respondent "suggested [they] should look into divorce mediation in Canada and . . . [they] made arrangement[s] for the Labor [D]ay weekend that was coming up." Petitioner Aff. ¶ 5 [Doc. No. 49].

Petitioner left for Canada the next day, August 27. Stip. ¶ 50 [Doc. No. 33]. Before he left, he hugged Respondent and the Children, and told them he loved them, and they did the same. Respondent Aff. ¶ 95 [Doc. No. 53]. Petitioner was still expecting Respondent to come up for Labor Day Weekend, and that he would have parenting time with the Children.

Petitioner left his work truck and trailer keys, fuel cards, and keys to the Dercy mechanic yard on the counter. Although he did not formally resign, he stopped working for Dercy.

On August 28 (the following day), Respondent told Petitioner she would not come to Canada for Labor Day. Stip. ¶ 51 [Doc. No. 33]. Even though Petitioner had brought MG2 back to Massachusetts after learning of the missing money, Respondent now told him "she would not visit over the following weekend because she feared [he] might take the girls and keep them in Canada. She stated she had spoken with an attorney in Canada and had been advised that her

case should be handled in the U.S. rather than in Canada, so she no longer wanted to participate in mediation in Canada." Petitioner Aff. ¶ 6 [Doc. No. 49]. She told him she had also "reached out to the embassy, Canadian law force, a Canadian attorney as well as [the] Salisbury police [department] and a [U.S.] attorney." Respondent Aff. ¶ 98 [Doc. No. 53].

On August 28, 2024, MG1 was approximately 4½ years old and MG2 was approximately 2½ years old. See Stip. ¶ 9 [Doc. No. 33].

### L.    September 2024 Onward: Divorce Proceedings

On September 3 (the day after Labor Day) and September 4, 2024, Respondent withdrew all funds from her individual Canadian savings and investment account and transferred $15,000 to her father in $5,000 increments. Hr'g Ex. 31. On September 4, Respondent's attorney filed Respondent's Complaint for Divorce in the Essex County Probate and Family Court for the Commonwealth of Massachusetts. Stip. ¶ 52 [Doc. No. 33]; see Hr'g Ex. 100. The Complaint alleges that the parties had last lived together on August 20, 2024, and that an irretrievable breakdown of the marriage began on that day.

Petitioner learned of the divorce action on September 5 or 6; when he called a lawyer in Canada to learn about the law in Massachusetts, he was informed that there was already a divorce case pending.

Because the Children were with Respondent in Massachusetts at that time, the Children's passports were with Respondent. Cf. Hr'g Ex. 42.3 (October text messages in which Respondent tells Petitioner that "I will provide all necessary documents and passports to travel smoothly" as the parties sorted out custody arrangements). Respondent refused to allow the Children to return

to Canada with Petitioner until there was a written agreement between them.[11] She testified that she had a concern the Children would not be allowed to reenter the United States, and that Petitioner's father especially would prevent this.[12]

Petitioner and Respondent entered into an initial custody agreement, which provided Petitioner with a single weekend of parenting time from September 20–22, 2024. Hr'g Ex. 102. Petitioner learned that the weekend after the divorce action had been filed, Respondent and the Children had gone fishing with an individual whom he now knows to be her boyfriend.

Petitioner accepted service of summons in the divorce action on October 11, 2024. Stip. ¶ 53 [Doc. No. 33]; see Hr'g Ex. 101. He filed an answer and counterclaim seeking to remove the Children to Quebec. Stip. ¶ 54 [Doc. No. 33]; see Hr'g Ex. 104. On October 23, he filed a motion for temporary custody orders, and a motion for a speedy hearing and short order notice; the latter motion was denied the next day. Stip. ¶¶ 55–56 [Doc. No. 33].

In November 2024, the parties signed an "Agreement for Temporary Orders," which is currently in effect, providing for shared custody, with Respondent having primary physical custody of the Children and sole use and occupancy of the home in Salisbury. Id. ¶ 57. It begins: "The parties agree that the following shall be a temporary order of this Court . . . ." Hr'g Ex. 103.

---

[11] In a verified motion Petitioner filed in the divorce action in October 2024, he stated that his "ability to have parenting time with the minor children is conditional on him agreeing to all of [Respondent's] demands[,]" that Respondent had not allowed him to stay in their Massachusetts home with the Children when he has had parenting time (even though her parents lived a few doors down), and that Respondent "has unilaterally changed the locks to the marital home denying [Petitioner] access[.]" Hr'g Ex. 105 ¶¶ 8, 10, 13, 16.

[12] Petitioner's father denied having any discussions about blocking the Children from leaving Quebec.

Petitioner believed that both parents' consent was necessary for renewal of the Children's I-94 numbers, but on November 2, 2024, Respondent renewed the Children's I-94 numbers without Petitioner's participation. Stip. ¶ 24 [Doc. No. 33].

In January 2025, Petitioner filed an Application to the Central Authority in Quebec for the return of the Children under the Hague Convention; based on that application, he initiated this federal action on February 26, 2025. Id. ¶¶ 61, 63. In light of this action, the custody portion of the divorce proceeding has been stayed since April 2025. Id. ¶ 60.

## II.     Conclusions of Law

### A.  Legal Standard

#### 1.  Overview

"The Hague Convention on the Civil Aspects of International Child Abduction is . . . intended to combat international child abductions during domestic disputes." Mendez v. May, 778 F.3d 337, 343 (1st Cir. 2015) (citing Abbott v. Abbott, 560 U.S. 1, 8 (2010)). "The Convention's underlying principle is that the courts of a child's country of habitual residence should be the entities to make custody determinations in the child's best interest." Id. (citations omitted).

 "A petitioner seeking the return of a child under the Convention must establish the child's wrongful removal by a preponderance of the evidence." Id. at 343 (citing 22 U.S.C. § 9003(e)(1)(A)). "The petitioner must show that he or she (1) seeks to return the child to the child's country of habitual residence, (2) had custody rights immediately prior to the child's removal, and (3) was exercising those rights." Id. (citing Hague Convention, art. 3). "If these three elements are met, and the petitioner has commenced judicial or administrative proceedings within one year of the date of wrongful removal, the Convention commands that the court reviewing the petition 'shall order the return of the child forthwith.'" Id. (quoting Hague

Convention, art. 12). Accordingly, ICARA includes the Congressional finding that "[c]hildren who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4).

"The Convention's return requirement is a 'provisional' remedy that fixes the forum for custody proceedings. . . . Upon the child's return, the custody adjudication will proceed in that forum." Monasky v. Taglieri, 589 U.S. 68, 72 (2020) (citing Linda Silberman, Interpreting the Hague Convention: In Search of a Global Jurisprudence, 38 U.C.D. L. Rev. 1049, 1054 (2005)). "[I]t is the job of the courts of [the child's habitual residence], not the district court, to 'make the appropriate custodial and family law determinations.'" da Silva v. de Aredes, 953 F.3d 67, 77 (1st Cir. 2020) (quoting Mauvais v. Herisse, 772 F.3d 6, 21 (1st Cir. 2014)); see also Vieira v. De Souza, 22 F.4th 304, 308 (1st Cir. 2022) ("Notably, an order of return pursuant to the Hague Convention is not a final determination of custody rights. It simply ensures that custodial decisions will be made by the courts of the children's country of habitual residence.") (citations omitted).

## 2.  Habitual Residence

"Removal under the Hague Convention is only appropriate if the child is being retained in a country other than his or her place of habitual residence." Mendez, 778 F.3d at 344 (citing Sanchez-Londono v. Gonzalez, 752 F.3d 533, 540 (1st Cir. 2014)).

"The Hague Convention does not define the term 'habitual residence.'" Monasky, 589 U.S. at 76. The concept of habitual residence was "well-established … in the Hague Conference" and the standards applied by the Federal Courts of Appeals have "share[d] a 'common' understanding: The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." Id. at 77 (citations omitted). A child's "residence in a particular

country can be deemed 'habitual,' however, only when her residence there is more than transitory. 'Habitual' implies '[c]ustomary, usual, of the nature of a habit.'" Id. at 76 (quoting Black's Law Dictionary 640 (5th ed. 1979)). The aim of this inquiry is "to ensure that custody is adjudicated in what is presumptively the most appropriate forum—the country where the child is at home." Id. at 79. "To a large extent, '[t]he Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence.'" da Costa v. de Lima, 94 F.4th 174, 185 (1st Cir. 2024) (quoting Abbott, 560 U.S. at 20).

The term "habitual residence" was "deliberately chose[n] . . . for its factual character, making it the foundation for the Convention's return remedy in lieu of formal legal concepts like domicile and nationality." Monasky, 589 U.S. at 79. "Because locating a child's home is a fact-driven inquiry, courts must be 'sensitive to the unique circumstances of the case and informed by common sense.'" Id. at 78 (citation omitted).

"For older children capable of acclimating to their surroundings, . . . facts indicating acclimatization will be highly relevant." Id. Courts have thus considered the following facts in determining whether children have acclimated to their surroundings:

> a change in geography combined with the passage of an appreciable period of time, age of the child, immigration status of child and parent, academic activities, social engagements, participation in sports programs and excursions, meaningful connections with the people and places in the child's new country, language proficiency, and location of personal belongings.

Id. at 78 n.3 (quoting Federal Judicial Center, J. Garbolino, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 67–68 (2d ed. 2015)) (internal quotation marks removed).

Because children depend on their parents as caregivers, "the intentions and circumstances of caregiving parents are relevant considerations[,]" "especially [for] those too young or

otherwise unable to acclimate[.]" <u>Id.</u> at 78.[13] "In discerning the parties' intentions, [the First Circuit has looked] 'specifically to the last moment of the parents' shared intent.' . . . Where a child has moved with a parent from one country to another, the record must evidence the parties' latest settled intention for the child to abandon a former place of habitual residence and acquire a new one." <u>Mendez</u>, 778 F.3d at 344.

The Ninth Circuit has noted that being habitually resident somewhere "need not mean that's where you plan to leave your bones[,]" and "one may effectively abandon a prior habitual residence without intending to occupy the next one for more than a limited period." <u>Mozes v. Mozes</u>, 239 F.3d 1067, 1074 (9th Cir. 2001), <u>abrogated on other grounds by</u> <u>Monasky</u>, 589 U.S. 68 (2020).[14] In <u>Mozes</u>, the Ninth Circuit also observed that there "are cases where the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration. Sometimes the circumstances surrounding the child's stay are such that, despite the lack of perfect consensus, the court finds the parents to have shared a settled mutual intent that the stay last indefinitely. When this is the case, we can reasonably infer a mutual abandonment of the child's prior habitual residence." <u>Id.</u> at 1077 (footnote and citations omitted). The <u>Monasky</u> court has noted further that "[a]n actual agreement between the parents is not necessary to establish an infant's habitual residence." <u>Monasky</u>, 589 U.S. at 71.

In sum, "a child's habitual residence depends on the totality of the circumstances specific to the case." <u>Id.</u> "No single fact . . . is dispositive across all cases." <u>Id.</u> at 78.

---

[13] In his concurring opinion, Justice Thomas offered the following additional factors to consider for whether a residence had become habitual for a child too young to acclimatize: "the presence or absence of bank accounts and driver's licenses, the length and type of employment, and the strength and duration of other community ties." <u>Id.</u> at 86, 88 (Thomas, J., concurring in part).

[14] <u>Monasky</u> abrogated the appellate standard of review applied in <u>Mozes</u> as well as its placement of greater weight on the shared intentions of the parents. <u>Monasky</u>, 589 U.S. at 76.

### 3.  Affirmative Defenses

Two of the "narrow exceptions" to return of a child under the Hague Convention, 22

U.S.C. § 9001(a)(4), are consent and subsequent acquiescence. Hague Convention, art. 13(a); 22

U.S.C. § 9003(e)(2)(B). The court "is not bound to order the return of [the children] if

[respondent] establishes by a preponderance of the evidence that [petitioner] had consented to or

subsequently acquiesced in [respondent's] removal or retention of [the children]." Nicolson v.

Pappalardo, 605 F.3d 100, 105 (1st Cir. 2010) (citations and internal quotation marks omitted).

The defense of consent "focuses on [petitioner's] intent prior to the child's retention," and can be

"evinced by the petitioner's statements or conduct, which can be rather informal." Id. (citation

omitted). "[T]he defense of acquiescence pertains only to what happened post-retention" and is

an "affirmative defense[] that should be narrowly construed." Darin v. Olivero-Huffman, 746

F.3d 1, 14, 16 (1st Cir. 2014).

### B.  Habitual Residence

Because the parties do not dispute that both parties exercised their custodial rights over

both Children, see Stip. ¶ 12 [Doc. No. 33], the primary question before the court is the

Children's place of habitual residence. See Mendez, 778 F.3d at 343; 22 U.S.C. § 9003(e)(1)(A)

(petitioner's burden of proof by preponderance of the evidence). "The place where a child is at

home, at the time of removal or retention, ranks as the child's habitual residence." Monasky, 589

U.S. at 77 (emphasis added). Here, the alleged wrongful retention occurred on August 28, 2024.

Guided by the factors set forth in Monasky, the court considers the totality of the circumstances

as of that date.

### 1.  Shared Intent of the Parties

Although the First Circuit's former approach of addressing shared intent as a primary

factor no longer controls, Monasky nevertheless highlighted that "the intentions and

circumstances of caregiving parents are relevant considerations" where "children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers." Monasky, 589 U.S. at 78. Because MG1 was only about to enter preschool and MG2 was only 2½ years old in August 2024, the parents' intentions are relevant here.

"In discerning the parties' intentions," the First Circuit has looked "'specifically to the last moment of the parents' shared intent.' . . . Where a child has moved with a parent from one country to another, the record must evidence the parties' latest settled intention for the child to abandon a former place of habitual residence and acquire a new one." Mendez, 778 F.3d at 344 (citation omitted).

Although Respondent may have intended to abandon Canada as a place of habitual residence and intended to acquire the United States as a new one, nothing in the record shows that both parties <u>shared</u> this intent.

In December 2022, the parties were clearly tentative when they made their first move, and Respondent testified that they did not initially sell their home because they wanted to have a plan if they wanted to go back.[15] Both parties testified that they initially moved to the United States for a trial period to see if it would work out. Notably, Respondent's parents' Haverhill apartment where Petitioner, Respondent, and their Children lived rent-free for their first nine months in Massachusetts did not even include Petitioner on the lease.

In 2023, when the parties sold their home in Canada and purchased a home in Salisbury, their intentions began to diverge. The parties do not dispute that they could not have afforded to

---

[15] As explained above, the letter Respondent drafted to cancel an education fund the parties had created for MG1 appears unrelated to the move, as it was dated June 2021, well before plans for the move materialized.

maintain their home in Canada while also paying rental costs for an apartment in Massachusetts. For Petitioner, the sale of one home to purchase another (rather than renting a home) was a strictly financial decision—even if that decision was not financially sound or not well planned. He was dissatisfied with the work Respondent was having him perform for Dercy at the time, as well as with the presence of her parents in their living conditions. Importantly, the parties do not dispute that one purpose of the move was to solve the problem of sharing a living space with and under the control of Respondent's parents. For Respondent, however, purchasing the Salisbury home meant a satisfaction with and commitment to settling in the United States. These conflicting views of the move may have been simultaneously true for each of them.

The paperwork completed by the parties in 2024 further demonstrates the conflict in their views. The Canadian NR73 forms the parties filled out for purposes of determining their residency status diverged significantly. The one Respondent signed on her own behalf, and the fully-typed version she or the accountant submitted on Petitioner's behalf, indicated a clear intention to leave Canada permanently and not return to live there, except as obligated by the circumstances of the parties' E-2 visa. This is in stark contrast to the marked-up version that Petitioner testified is the only version he signed, which indicated temporary residence in the United States with the intention of returning to Canada. Furthermore, Respondent claims to have submitted a green card application on behalf of the whole family, of which Petitioner was unaware until after divorce proceedings had been initiated months later.

As late as August 18 or 19, 2024, Petitioner wrote a letter to Respondent explaining his dissatisfaction with the United States and reiterating his desire to return to Canada. He left for Canada on August 20 to work out a plan for the family's return and then learned on August 23 that Respondent had zeroed out their savings account. Even after Respondent suggested divorce

mediation in Canada, and Petitioner packed up his belongings at the Salisbury home and left for

Canada, Petitioner still believed Respondent and the children would return to Canada for the

Labor Day Weekend. Petitioner also believed that the Children would be permanently returned to

Canada at least by November 2024, when their I-94 numbers expired. It was his understanding

that their I-94 numbers could not be renewed without his consent, and he clearly did not consent.

Therefore, on August 28, 2024, when Respondent cancelled her return to Canada for the

Labor Day weekend, the parties did not have a settled intent to abandon Quebec and make

Massachusetts their habitual residence. The "parties' latest settled intention" together, Mendez,

778 F.3d at 344, was to move to Massachusetts for a trial to see if things would work out,

including whether they liked it here, and not just whether Respondent's parents' business was

successful. Their opinions about whether their new lives were working out diverged after they

arrived here.

### 2. Immigration Status and Employment

The family's immigration status underscores the temporary nature of their relocation.

Notwithstanding Respondent's unilateral efforts to terminate residency status in Canada and to

seek permanent residency in the United States, the parties were legally present in the United

States on nonimmigrant E-2 visas and as of August 28, 2024, the family's I-94 numbers were set

to expire in three months. Respondent attested in her visa application that "[she] intend[s] to

return to Canada upon completion of [her] authorized temporary period of stay under an E-2

Visa." Hr'g Ex. 4.

The E-2 visa status was based on Respondent's work for her parents' company. If

Respondent stops working for Dercy, she and the family would have no basis for legal status in

the United States; and if the parties are divorced, Petitioner will have no legal status in the

United States. And while Respondent appeared to view the E-2 visa as automatically renewable,

28

the issuance of a renewed visa is within the United States government's discretion, and on renewal, remains a non-immigrant visa.

The family's "temporary visa[] cast[s] considerable doubt on whether they would be allowed to remain here indefinitely even if they wished to." Mozes, 239 F.3d at 1082; see also id. at 1082 n.45 ("While an unlawful or precarious immigration status does not preclude one from becoming a habitual resident under the Convention, it prevents one from doing so rapidly. . . . It is also a highly relevant circumstance where, as here, the shared intent of the parents is in dispute.").

Moreover, the parties' economic base—employment with Dercy—was anchored in Canada. Prior to their move, they worked for the Canadian counterpart of Dercy. While employed by Dercy in the United States, Petitioner was frequently sent back to Canada for work. He also testified that most of Respondent's job for the United States arm of Dercy could be accomplished remotely from Canada.

### 3.  Bank Accounts and Driver's Licenses

As to bank accounts, the parties maintained joint bank accounts both in Canada and in the United States. When Petitioner worked in Canada, his pay went into the Canada account; when he worked in the United States, he was paid in the U.S. account.

Both parties maintained their Canadian driver's licenses throughout their time in the United States leading up to August 28, 2024.

### 4.  Strength and Duration of Community Ties

As of August 28, 2024, MG1 had spent nearly half her life and MG2 had spent most of her life residing in Massachusetts, and their pediatrician for primary care visits—with the exception of one follow-up vaccination in Quebec—was in Massachusetts.

However, the vast majority of the Children's familial ties, on both parents' sides of the family, was in Quebec. They did not make friends with neighbors in Haverhill, and there were no other children in the neighborhood in Salisbury. They attended a daycare with four other children, but for the first two months, MG1 was enrolled only part-time and spent the remainder of her time with Petitioner in his work truck. As of August 28, 2024, MG1 was leaving that daycare for preschool.

The Children attended some birthday parties with other children from the daycare, and attended one trick-or-treating event with the daycare director's family. They did not acquire public library cards in Massachusetts until after the relevant period.

The parties' community ties are similarly limited. Respondent made a few friends through the community of mothers at the Children's daycare and saw them for dinner alone. Petitioner made no friends. Their social life otherwise consisted of spending weekends alone with the Children, hosting family or friends from Quebec, or visiting family or friends in Quebec.

### 5. Language Proficiency

The Children arrived in the United States speaking no English but have since adapted and can speak both English and French. Only Petitioner struggled with English due to his limited interactions with English speakers until the divorce action was initiated.

### 6. Location of Personal Belongings

With the exception of the necessities Petitioner packed up when he left the home in August 2024, the family's possessions are all in the marital home in Salisbury.

### 7. Conclusion

Looking at the totality of the circumstances, particularly where only one factor (the location of personal belongings) clearly points in Respondent's favor, and recognizing the young

age of the Children, the court finds by a preponderance of the evidence that the Children's

habitual residence as of August 28, 2024, was Canada.

### C.    Affirmative Defenses

Respondent asserts two defenses: that Petitioner "had consented to or subsequently

acquiesced in the removal or retention" of the Children. Hague Convention, art. 13(a); see also

22 U.S.C. § 9003(e)(2)(B) (respondent's burden of proof by preponderance of the evidence).

### 1.    Consent

The defense of consent "focuses on [petitioner's] intent prior to the child's retention,"

and can be "evinced by the petitioner's statements or conduct, which can be rather informal."

Nicolson, 605 F.3d at 105 (citation omitted). For the reasons discussed above, Petitioner

consented to the family living in Massachusetts temporarily on a trial basis. To the extent a green

card application was submitted on the family's behalf, there is no credible evidence that

Petitioner was aware of or participated in that application, and so cannot have consented to the

family remaining indefinitely on that basis. See Mozes, 239 F.3d at 1082 n.45 ("had [petitioner]

helped [respondent] obtain a permanent residence visa for herself and the children, we could

infer his consent to a residence of indefinite duration"). Consent prior to the time of retention is

therefore no defense for Respondent.

### 2.    Acquiescence

"[T]he defense of acquiescence pertains only to what happens post-retention" and is an

"affirmative defense[] that should be narrowly construed." Darin, 746 F.3d at 14, 16. In

Nicolson, the First Circuit considered whether entering into a consent order for temporary

custody constituted "a 'clear[ ] and unequivocal[ ]' expression of an agreement by [petitioner] to

have final custody determined in a Maine court, . . . [or] 'a convincing written renunciation of

rights' to this effect[.]" Nicolson, 605 F.3d at 106, 108 (citations omitted). Because the consent

order contained language "contemplat[ing] changes in temporary custody by a non-Maine court," the First Circuit found the agreement was not one "to let the Maine courts determine final custody." Id. at 107–08.

Respondent argues that Petitioner's voluntary participation in a divorce action initiated in Massachusetts, including as to temporary custody arrangements providing that the Respondent has primary physical custody of the Children in Massachusetts, amounts to acquiescence in her retention of the Children here. But nothing in those proceedings indicates that Petitioner clearly and unequivocally agreed to have the Massachusetts court determine final custody or renounced his rights to that effect. See Nicolson, 605 F.3d at 108. The record shows that Petitioner had limited options to see his Children: they and their passports were with Respondent in their Salisbury house, Respondent had changed the locks, and Respondent testified that she refused to let the Children see Petitioner in Canada without a written agreement. The agreements themselves are temporary in nature, and as relevant to physical custody are entered into between the parties themselves rather than by order of the court. The first stipulation only addressed Petitioner's parenting time with the Children over the course of one weekend in September. See Hr'g Ex. 102 ¶ 1. The second stipulation, which currently remains in effect, is titled "Agreement for Temporary Orders" and the paragraphs pertaining to physical custody only address arrangements from November 22, 2024, through the Christmas and New Year's holiday period of 2025. See Hr'g Ex. 103 ¶¶ 2(a), (d). The only portions of the document that are "submitted to [the] court for determination" pertain to the sharing of costs. See id. ¶¶ 2(e), (f), (i), (j). Petitioner also filed a counterclaim in that action seeking removal of the Children to Quebec, Canada. Hr'g Ex. 104.002 ¶ 6(c). Finally, the parties do not dispute that the Massachusetts court stayed custody matters pending this court's determination under the Hague Convention.

Respondent has failed to meet her burden of proving by a preponderance of the evidence that Petitioner's participation in the divorce action constituted "subsequent[] acquiesce[nce] in the . . . retention" of the Children. Hague Convention, art. 13(a).

**III.    Order of Return**

For the foregoing reasons, the court grants the Petitioner's <u>Verified Complaint for Return of Minor Children to Canada Pursuant to the Applicable Hague Convention</u> [Doc. No. 1]. The court orders the return of MG1 and MG2 to Canada for a custody adjudication to proceed in the appropriate Canadian court.

- No later than September 2, 2025, Respondent shall return the Children to Quebec, Canada, or shall provide Petitioner with the Children's passports and allow him to take temporary custody of the Children so that he may return the Children to Quebec, Canada, where either party may file an action to address custody of the Children on a temporary and permanent basis.

- Until further orders are entered by a Canadian court of competent jurisdiction, neither party shall apply for or facilitate the issuance of any passports or other immigration related paperwork for the Children or remove the Children from Canada.

- The proceedings in Essex Probate and Family Court, Docket No. 24D-1750 DR, which have been stayed, shall continue to be stayed pending an order from a court of competent jurisdiction in Quebec.

- Respondent is hereby restrained from initiating or maintaining any further legal proceedings within the United States concerning the Children, including but not limited to proceedings in any Massachusetts court relating to the Children or Petitioner, until

such time as a court in Quebec has made a custody determination, except that this order does not limit Respondent's right to appeal this court's Judgment.

- The court will enter Judgment in accordance with this Memorandum and Order, and certified copies of this Judgment shall be provided to counsel for Petitioner, who shall transmit the same to the U.S Department of State acting as the USA Central Authority and Office of Passport Policy and Advisory Services, 1111 19th Street, N.W., Suite 260, Washington, D.C. 20522-1705, and to the appropriate Canadian authorities.

## IV.    Attorney's Fees

The Hague Convention provides that courts "may, where appropriate, direct the person who removed or retained the child, or who prevented the exercise of rights of access, to pay necessary expenses incurred by or on behalf of the applicant . . . ." Hague Convention, art. 26. As implemented by ICARA, however, a fee award is mandatory unless "clearly inappropriate":

> Any court ordering the return of a child pursuant to an action brought under section 9003 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, . . . during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

22 U.S.C. § 9007(b)(3).

Petitioner has filed an Affidavit of Fees and Expenses [Doc. No. 40]. Where Respondent bears the burden of establishing that an award of fees would be unwarranted under the statute, Respondent is directed that she may file any opposition to the award of fees within two weeks of entry of this order. Petitioner's response, if any, must be filed within 7 days of Respondent's opposition.

IT IS SO ORDERED.

August 26, 2025                    /s/ Indira Talwani
                                  United States District Judge