# United States Court of Appeals
## For the First Circuit

No. 25-1831

TOMMY GIGUERE,

Petitioner, Appellee,

v.

STACY TARDIF,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Barron, Chief Judge,
Lipez and Rikelman, Circuit Judges.

Matthew P. Barach, with whom Barach Law Group LLC was on brief, for appellant.

Wendy O. Hickey, with whom Maureen McBrien and Brick, Jones, McBrien & Hickey LLP were on brief, for appellee.

August 17, 2026

**LIPEZ, Circuit Judge.** Respondent Stacy Tardif challenges the district court's conclusion that, under the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), her two young children must be returned to Canada from their home with her in Massachusetts. Their father, petitioner Tommy Giguere, lives in Canada. She asserts that the court misapplied the relevant precedent and erroneously determined that the children's "habitual residence" is Canada. After carefully reviewing the record and the district court's factual findings and legal analysis, we detect no error and therefore affirm.

**I.**

We draw the background facts from the district court's opinion. See Giguère v. Tardif, No. 1:25-cv-10468, 2025 WL 2452168, at *1-12 (D. Mass. Aug. 26, 2025). Unless otherwise noted, the facts are undisputed.

Tardif and Giguere are Canadian citizens who were married in 2021 and have two young children, both born in Quebec. In December 2022, the couple and their children, then ages 2 1/2 and six months, moved to Massachusetts after they were all granted E-2 non-immigrant visas by the United States. Both spouses worked for Transport Dercy Inc. ("Dercy"), a transportation company owned by Tardif's parents, which was expanding into the United States at the time. They both decided to move "to help the launch of the

business." Id. at *3. Their visas were dependent on their employment at Dercy.[1] According to both parties, they moved on a "trial" basis "to see if the business was successful and if they liked it or not." Id. They left most of their personal possessions in their home in Canada and moved into an apartment rented for them by Tardif's parents in Haverhill, Massachusetts.

During the next year and a half, Tardif and Giguere maintained joint bank accounts in Canada and the United States, depositing funds earned in Canada in the Canadian account and funds earned in the United States in the U.S. account. Both spouses kept their Canadian driver's licenses. Though Giguere expected his work for Dercy to be in Massachusetts, he traveled to Quebec a few days a week "because there was not enough work for him to do in Massachusetts." Id. at *4. The family eventually sold their home in Canada during this time and later purchased a condominium in Salisbury, Massachusetts, where they moved their possessions.

After moving to the condominium, Tardif and Giguere began to develop different expectations about their future in the

[1] As the district court explained in its decision, "[t]he E-2 visa is a nonimmigrant classification for a foreign national (1) 'when investing a substantial amount of capital in a U.S. business,' which requires a showing of at least 50% ownership of the enterprise; or (2) who is a qualifying employee of such a person or organization. USCIS, E-2 Treaty Investors, https://www.uscis.gov/working-in-the-united-states/temporary-workers/e-2-treaty-investors [https://perma.cc/Y7VP-52EE]. The E-2 visa is valid for up to five years with the possibility of further extension." Giguère, 2025 WL 2452168, at *2 n.3.

United States. Tardif believed they decided to sell their home in Canada because they enjoyed their life in the United States enough to stay permanently. Giguere, however, struggled to adapt to the United States and considered the home sale a temporary "financial decision." Id. at *15; see also id. at 4.[2] Later, when completing paperwork for the Canadian government to update their residency status, Tardif and Giguere provided answers that "diverged significantly." Id. at *15. The version of the form that Giguere said he completed and signed "indicated temporary residence in the United States with the intention of returning to Canada." Id. However, Tardif's answers -- and the version she typed up and submitted on behalf of both spouses -- "indicated a clear intention to leave Canada permanently and not return to live there." Id.[3]

By August 2024, a critical month in the court's analysis, as we shall explain, the children were approximately 4 1/2 and 2

[2] At the hearing, the parties agreed that they could not have afforded to maintain a home in Canada while also paying rent in Massachusetts, and that another purpose of the move was to have their own residence that was not under the control of Tardif's parents, who rented the Haverhill apartment for them and often stayed there. Although these reasons to move were not in dispute, each party ascribed a different significance to the move in terms of their long-term plans. Giguère, 2025 WL 2452168, at *4.

[3] At the hearing, the parties disputed whether Giguere signed the later version that Tardif submitted. The district court found Giguere's testimony that he only signed the earlier version more credible. It accordingly treated the earlier version as "representing [Giguere's] intentions and state of mind in March 2024." Giguère, 2025 WL 2452168, at *7.

1/2 years old. While they primarily communicated in French when they first arrived in the United States, they could now speak English as well. They had connections in Massachusetts typical for the young children of working parents: they were enrolled in daycare near their home, they visited a local pediatrician five to six times, and they attended a handful of birthday parties. Tardif befriended some parents whose children attended the same daycare, but Giguere "did not make close friends in the United States." Id. at *8. Indeed, "[b]etween December 2022 and August 2024, the parties primarily spent their weekends alone with their [c]hildren, visiting Quebec, or in Massachusetts hosting friends or family from Quebec. . . . On average, they returned to Quebec about once every three weeks." Id.

Starting in March 2024, Giguere expressed a desire to return to Canada with the family, telling Tardif he was unhappy living in the United States. Tardif did not want to move but indicated that a return to Canada was possible, and Giguere said they could revisit the conversation after the summer. Giguere reiterated his preference for returning to Canada throughout the following months and again in late August 2024. He traveled to Canada that month,[4] at which point Tardif claims there was "an

[4] Both parties agree it was a temporary visit, but they cite slightly different reasons for it. Giguere said he was returning to visit friends, inquire about childcare, and engage in "job planning," while Tardif said that he was returning to inquire only

irretrievable breakdown of the marriage." Id. at *9. A few days after his departure, Giguere discovered that Tardif had withdrawn the entirety of their joint savings and investment accounts in Canada. On August 28, Tardif refused to bring the children to Canada to spend Labor Day weekend with Giguere, as she had previously agreed to do. She soon thereafter changed the locks on the doors of their Massachusetts residence.

In early September 2024, Tardif filed for divorce in Massachusetts. In October, Giguere filed an answer and counterclaim seeking custody of the children and their removal to Canada. The parties agreed on a series of temporary custody arrangements. Giguere subsequently filed applications under the Hague Convention in Canada on January 21, 2025, and in the United States on February 26, 2025, seeking the return of the children to Canada. After Giguere's filings, the custody portion of the divorce proceedings was stayed.

In August 2025, after a three-day evidentiary hearing in Massachusetts federal court on Giguere's U.S. Hague Convention application, the district court ordered the return of the children to Canada. In its judgment, the court concluded that Tardif's conduct on August 28, 2024, constituted a "wrongful retention of the minor children . . . in the United States within the meaning

---

about business opportunities in Canada. Giguère, 2025 WL 2452168, at *9.

of Article 3 of the Hague Convention." In reaching its conclusion, the district court determined that the country of "habitual residence" of the children in this case was Canada, not the United States. Id. at *16. This timely appeal followed.

**II.**

**A. The Concept of Habitual Residence**

The Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11 (Treaty Doc.), implemented in the United States by the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001-11, provides that "a child wrongfully removed from her country of 'habitual residence' ordinarily must be returned to that country." Monasky v. Taglieri, 589 U.S. 68, 70-71 (2020).[5] The Hague Convention is meant to: (1) "secure the prompt return of children wrongfully removed to or retained in any Contracting

[5] The phrase "wrongful removal or retention" appears throughout the Hague Convention text. "Generally speaking, 'wrongful removal' refers to the taking of a child from the person who was actually exercising custody of the child. 'Wrongful retention' refers to the act of keeping the child without the consent of the person who was actually exercising custody. The archetype of this conduct is the refusal by the noncustodial parent to return a child at the end of an authorized visitation period." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494-01, 10503 (Mar. 26, 1986). For the purposes of our legal analysis, the term "wrongful removal or retention" is a singular legal concept. While the present case deals with an instance of wrongful retention, rather than removal, any reference hereinafter only to wrongful removal incorporates the concept of wrongful retention and vice versa.

State," Hague Convention, art. 1, T.I.A.S. No. 11670, and (2) "ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States," Karkkainen v. Kovalchuk, 445 F.3d 280, 287 (3d Cir. 2006) (quoting Hague Convention, art. 1, T.I.A.S. No. 11670). The Convention is "not designed to settle international custody disputes, but rather to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in . . . forum shopping." Id. In other words, a petition filed under the Convention does not empower a court to "preside over a custody battle." Rodrigues v. Silveira, 141 F.4th 355, 358 (1st Cir. 2025). Rather, it empowers a court to determine where custody should be resolved after a child is wrongfully withheld from one parent.

In seeking the return of a child under the Convention, a petitioner must prove the removal or retention of the child was wrongful by a preponderance of the evidence. Mendez v. May, 778 F.3d 337, 343 (1st Cir. 2015) (citing 22 U.S.C. § 9003(e)(1)(A)). The removal or retention of a child is wrongful where it is in breach of one parent's rights of custody under the law of the country "in which the child was habitually resident immediately before the removal or retention." Hague Convention, art. 3, T.I.A.S. No. 11670. Accordingly, "[t]he petitioner must show that he or she (1) seeks to return the child to the child's country of

habitual residence, (2) had custody rights immediately prior to the child's removal, and (3) was exercising those rights." Mendez, 778 F.3d at 343 (citing Hague Convention, art. 3, T.I.A.S. No. 11670).[6] Determining a child's habitual residence is therefore critical to carrying out the Convention's overarching purpose.

**B. Identifying a Child's Habitual Residence**

As a starting point in the habitual residence analysis, the Convention identifies the date of wrongful removal or retention as the critical time, guiding courts to consider only facts before this date in their determinations. Hague Convention, art. 3, T.I.A.S. No. 11670.[7] This critical point of inquiry is also reflected in the jurisprudence on habitual residence in Hague Convention cases. See Monasky, 589 U.S. at 77 (identifying "the time of removal or retention" as the proper moment of inquiry for

---

[6] Tardif expressly concedes elements 2 and 3 of wrongful removal or retention.

[7] The relevant language tying the habitual residence analysis to the date of wrongful removal is set forth in Article 3 of the Convention:

> The removal or the retention of a child is to be considered wrongful where--
> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention . . . .

Hague Convention, art. 3, T.I.A.S. No. 11670.

the habitual residence analysis).[8]

The Convention does not define "habitual residence." The term's meaning has instead developed through caselaw. The Supreme Court has said that "the child's habitual residence" is "[t]he place where a child is at home," id. at 77, and where her residence is "more than transitory," id. at 76. The Court has explained that "locating a child's home is a fact-driven inquiry," requiring courts to be "sensitive to the unique circumstances of the case and informed by common sense." Id. at 78 (quoting Redmond v. Redmond, 724 F.3d 729, 744 (7th Cir. 2013)). In setting forth a "totality of the circumstances" test in Monasky to assess habitual residence, the Supreme Court resolved differences in approach among the circuits with respect to two considerations: the degree to which older children have acclimated to their surroundings and the nature of parental intent to settle in a country before the date of wrongful retention.[9] The Court

[8] There are several affirmative defenses available to overcome a finding of habitual residence, some of which require a court to consider facts past the date of wrongful removal or retention. Tardif raises three defenses in this case: the now-settled doctrine, consent, and acquiescence. We address these defenses in Section II.E.

[9] The Court explained that it granted certiorari in Monasky, in part, to "clarify the standard for habitual residence . . . in view of differences in emphasis among the Courts of Appeals." 589 U.S. at 76; see also id. (comparing, as examples, Taglieri v. Monasky, 907 F.3d 404 (6th Cir. 2018), where the Sixth Circuit described the "inquiry into the child's acclimatization as the 'primary' approach," with Mozes v. Mozes, 239 F.3d 1067 (9th Cir.

recognized that these were "relevant considerations," but that "[n]o single fact . . . is dispositive across all cases." Id.

Accordingly, courts consider a range of factors to determine whether children are "at home" in a particular environment. Id. at 77-78. Those factors can vary according to the age of the children at issue. For older children, who are "capable of acclimating to their surroundings," id. at 78, courts have identified factors they consider indicative of acclimatization, including age, immigration status, meaningful connections with the country, and language proficiency, id. at 78 n.3 (citing Federal Judicial Center, J. Garbolino, The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges 67–68 (2d ed. 2015)).

For children too young to acclimatize themselves, the Supreme Court explained that the intentions of caregiving parents are relevant because such children depend more on their caregivers than older children. Id. at 78. Additionally, factors addressing the parents' circumstances are considered. In a concurring opinion in Monasky, Justice Thomas identified "the presence or absence of

2001), where the Ninth Circuit "plac[ed] greater weight on the shared intentions of the parents"). In our court, we typically looked to evidence of acclimatization only "when the party opposing return aver[red] that the child's life is so firmly embedded in his or her new country that acclimatization should overcome the parties' past shared intent for the child to live elsewhere." Mendez, 778 F.3d at 344 n.2, 346 n.3.

bank accounts and driver's licenses, the length and type of employment, and the strength and duration of other community ties" as relevant considerations in such cases. Id. at 88 (Thomas, J., concurring in part).

**C. The District Court's Determination**

Guided by the requirements of the Hague Convention and Monasky, the district court considered the totality of the circumstances as of the date of wrongful retention on August 28, 2024 -- the date that Tardif kept the children from visiting Giguere -- to determine that Canada was the children's country of habitual residence.

The court observed that, under Monasky, shared parental intent is relevant "where children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers." Giguère, 2025 WL 2452168, at *14 (citation modified) (quoting Monasky, 589 U.S. at 78). The court referenced, among other things, the parties' decision to "move[] to the United States for a trial period," the differing views they had about selling their Canadian home, and the divergent responses they gave on their Canadian residency forms. Id. at *14-15. The court concluded that although Tardif may have intended to make the United States her country of habitual residence, abandoning Canada, Giguere did not share this intention. Therefore, there was no shared intent. Id. at *14.

The district court also noted that the family's immigration status "underscore[d] the temporary nature of their relocation," as their E-2 visas were non-immigrant visas and their renewal was subject to the United States government's discretion. Id. at *15. This status "cast considerable doubt on whether they would be allowed to remain here indefinitely even if they wished to." Id. at *16 (citation modified). Moreover, because Giguere's job frequently sent him back to Canada, and because both parents previously worked for the Canadian counterpart of the company they worked for in the United States, the court considered that "the parties' economic base . . . was anchored in Canada." Id.

The district court also referenced the couple's bank accounts and driver's licenses, noting that they held joint bank accounts in Canada and the United States but had maintained their Canadian driver's licenses through the time of wrongful retention. Id. The court went on to discuss the strength and duration of the family's community ties in Canada and Massachusetts, finding that "the vast majority of the [c]hildren's familial ties, on both parents' sides of the family, was in Quebec." Id. In addition, while most of the children's primary care doctor visits took place in Massachusetts, where their pediatrician was based, the family did not make friends with neighbors or other children's families in their time in Massachusetts. The children attended only a few social events in their Massachusetts community, and the parents'

"community ties [were] similarly limited." Id.

The court considered briefly two final factors in assessing habitual residence: language proficiency and the location of the family's personal belongings. First, it noted that the children, in adapting to their surroundings in Massachusetts, can speak both English and French, but that Giguere "struggled with English due to his limited interactions with English speakers." Id. Second, it considered that the family's possessions were all located in Massachusetts, not in Canada.

The court then concluded, "[l]ooking at the totality of the circumstances, particularly where only one factor (the location of personal belongings) clearly points in [Tardif's] favor," that the preponderance of the evidence shows that the children's habitual residence as of the date of wrongful retention was Canada. Id.

**D. Tardif's Challenges to the District Court's Determination**

The location of a child's "habitual residence" under the Hague Convention is a "mixed question" of law and fact. Monasky, 589 U.S. at 84. Where mixed questions involve predominantly legal issues, our review is de novo, but when predominantly factual, our review is for clear error. See id. at 83-84. We may not overturn a factual finding unless, after reviewing the entire record, we have a "definite and firm conviction that a mistake has been committed." da Costa v. de Lima, 94 F.4th 174, 181 (1st Cir. 2024)

(quoting ST Eng'g Marine, Ltd. v. Thompson, Maccoll & Bass, LLC, P.A., 88 F.4th 27, 32 (1st Cir. 2023)). Tardif argues that the district court "committed clear error by unduly focusing on an agreement of the parties" in its analysis and "disregarding the totality of [the] circumstances." Both parties agree that clear error review applies to Tardif's arguments. We thus apply that standard in reviewing Tardif's arguments.

They are unavailing. First, although the district court addressed the shared intent of the parents first and emphasized that factor, the court did not rely unduly on the parents' intent in making its habitual residence determination. To the contrary, as described above, it considered a range of other factors in its analysis. See supra Section II.C. Attention to the parents' expectations was appropriate under Monasky.

Tardif highlights no facts from the period prior to her wrongful retention of the children in August 2024 that the district court failed to consider in its totality-of-the-circumstances analysis. The only additional facts she offers relate to circumstances that developed after the date of wrongful retention. As we have explained, such facts are not relevant to the habitual residence analysis. See Hague Convention, art. 3, T.I.A.S. No. 11670; Monasky, 589 U.S. at 77. Tardif herself acknowledges that, under Monasky, "[t]he place where a child is at home at the time of removal or retention is the child's habitual residence."

**E. Affirmative Defenses**

We now turn to the defenses that Tardif raises. The Hague Convention requires the prompt return of a wrongfully removed child to his or her country of habitual residence, Monasky, 589 U.S. at 72; Avendano v. Balza, 985 F.3d 8, 11 (1st Cir. 2021) (discussing the Convention's "strong presumption of return"), "unless one of the narrow exceptions set forth in the Convention applies," 22 U.S.C. § 9001(a)(4). These affirmative defenses are narrowly construed. Rodrigues, 141 F.4th at 358; Darín v. Olivero-Huffman, 746 F.3d 1, 14 (1st Cir. 2014). Under the Convention, there is "a strong presumption in favor of returning a wrongfully . . . retained child." Darín, 746 F.3d at 8. Indeed, "courts retain the discretion to order the child returned even if they consider that one or more of the exceptions applies." Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494-01, at 10509 (March 26, 1986); see also Rodrigues, 141 F.4th at 358. We review a district court's factual findings on these affirmative defenses for clear error. See Monasky, 589 U.S. at 84.

**1. The Now-Settled[10] Doctrine**

Under this exception, after a court has made a finding

[10] We have also previously referred to this doctrine as the "well settled" defense. See da Silva v. de Aredes, 953 F.3d 67, 75 (1st Cir. 2020) (referring to the "well settled" defense).

on habitual residence, it may nonetheless decline to order the return of a child to that country if the retaining parent "proves by a preponderance of the evidence that (a) 'the petition for return has been filed one year or more after the wrongful removal' and (b) 'the child is now settled in the new country.'" Rodrigues, 141 F.4th at 358 (emphasis added) (quoting da Silva, 953 F.3d at 75).

The "now-settled" doctrine has no place in this case.[11] Giguere submitted his petition in January 2025 in Canada and a few weeks later in the United States -- well within one year of the wrongful retention. This defense is therefore unavailable.

We also note that Tardif conflates two different legal concepts by arguing that the district court should have considered the children's "acclimatization" in Massachusetts up to the time of the evidentiary hearing on July 16, 2025, to find that they were "now settled" there. As explained above, "acclimatization," while similar to the "now-settled" doctrine in terms of the kinds of facts relevant to each concept, is only legally relevant to the court's habitual residence analysis, which exclusively considers facts leading up to the date of wrongful removal or retention -- and no later. Tardif's assertion that the court should also have

[11] The district court appropriately did not even mention the now-settled defense in its decision.

considered facts prior to the hearing in July 2025 is simply not the law.

**2. Consent**

Despite a finding of habitual residence, a court is not required to order the return of the child if the retaining parent "establishes by a preponderance of the evidence that [the non-retaining parent] 'had consented to . . . [the] removal or retention.'" Nicolson v. Pappalardo, 605 F.3d 100, 105 (1st Cir. 2010) (quoting Hague Convention, art. 13(a), T.I.A.S. No. 11670); see also 22 U.S.C. § 9003(e)(2)(B). "The consent defense involves the petitioner's conduct prior to the contested removal or retention." Darín, 746 F.3d at 14 (emphasis omitted) (quoting Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005)). Consent may be proven through the non-retaining parent's statements or conduct, even if informal. Nicolson, 605 F.3d at 105.

Tardif argues that because Giguere's "actions prior to the breakdown of the marriage evidenced his consent to liv[e] and rais[e] the children" in Massachusetts, she has met her burden to establish the defense of consent. For the reasons discussed above related to shared intent, Giguere did not consent to the children's retention in Massachusetts. He only consented to living there on a trial basis, repeatedly told Tardif that he was unhappy living there and wanted to return to Canada, and did not actively participate in any legal procedures to make Massachusetts the

children's long-term residence before August 28, 2024. The district court considered these facts and found that consent was no defense for Tardif. Giguère, 2025 WL 2452168, at *17. We find no error in this determination.

**3. Acquiescence**

A court is also not required to order the return of the child to the country of habitual residence if the retaining parent shows "that [the non-retaining parent] 'had . . . subsequently acquiesced in [the] removal or retention.'" Nicolson, 605 F.3d at 105 (quoting Hague Convention, art. 13(a), T.I.A.S. No. 11670); see also 22 U.S.C. § 9003(e)(2)(B). The defense of "[a]cquiescence tends to require more formality than consent" and "calls for definiteness and clarity, i.e., a 'clear and unequivocal expression of an agreement' or 'a convincing written renunciation of rights.'" Darín, 746 F.3d at 16-17 (quoting Nicolson, 605 F.3d at 108). When there is no formal indication of acquiescence, courts look to the subjective intent of the parent who allegedly acquiesced as reflected in conduct or statements. See id. at 16; Baxter, 423 F.3d at 371.

Tardif argues that Giguere acquiesced to the retention of the children in Massachusetts. The court rejected this claim with the following analysis, which we quote at length as a necessary prelude to the legal discussion that follows:

Respondent argues that Petitioner's voluntary participation in a divorce action initiated in Massachusetts, including as to temporary custody arrangements providing that the Respondent has primary physical custody of the Children in Massachusetts, amounts to acquiescence in her retention of the Children here. But nothing in those proceedings indicates that Petitioner clearly and unequivocally agreed to have the Massachusetts court determine final custody or renounced his rights to that effect. The record shows that Petitioner had limited options to see his Children: they and their passports were with Respondent in their Salisbury house, Respondent had changed the locks, and Respondent testified that she refused to let the Children see Petitioner in Canada without a written agreement. The agreements themselves are temporary in nature, and as relevant to physical custody are entered into between the parties themselves rather than by order of the court. The first stipulation only addressed Petitioner's parenting time with the Children over the course of one weekend in September. The second stipulation, which currently remains in effect, is titled "Agreement for Temporary Orders" and the paragraphs pertaining to physical custody only address arrangements from November 22, 2024, through the Christmas and New Year's holiday period of 2025. The only portions of the document that are "submitted to [the] court for determination" pertain to the sharing of costs. Petitioner also filed a counterclaim in that action seeking removal of the Children to Quebec, Canada. Finally, the parties do not dispute that the Massachusetts court stayed custody matters pending this court's determination under the Hague Convention. Respondent has failed to meet her burden of proving by a preponderance of the evidence that Petitioner's participation in the divorce action constituted "subsequent[] acquiesce[nce] in the . . . retention" of the [c]hildren.

Giguère, 2025 WL 2452168, at *17-*18 (first and second alterations in original) (citations omitted).

We agree with the district court that none of Giguere's actions demonstrates acquiescence to Tardif's retention of the children in Massachusetts. We emphasize again that, as an affirmative defense, acquiescence is "narrowly construed." Darín at 14; see also 51 Fed. Reg. at 10509 (observing that the Convention's exceptions should be allowed "only in clearly meritorious cases").

Importantly, the relevant inquiry for acquiescence under the Convention is whether the non-retaining parent "subsequently acquiesced in the removal or retention" of the children. Hague Convention, art. 13(a), T.I.A.S. No. 11670. We have also said that "a clear and formal consent order by the non-U.S. parent agreeing to let a state court decide final custody would, both linguistically and for policy reasons, warrant treatment as acquiescence" or "alternatively, [as] a waiver of Hague Convention rights." Nicolson, 605 F.3d at 107 (emphasis omitted).

Tardif does not raise the concept of waiver. Relying on Nicolson, Tardif argues that Giguere acquiesced to the retention of the children in Massachusetts by, in part, filing his counterclaim. Nicolson does not support her claim of acquiescence. There, the court rejected as adequate to show acquiescence a consent order in which the non-retaining parent gave "full

temporary custody" to the retaining parent, id. at 109 (emphasis added) -- distinguishing the circumstances from the hypothetical situation of a consent order allowing a state court to decide final custody, id. at 106-07. Here, Giguere requested custody through a counterclaim but otherwise similarly agreed only to temporary custody arrangements while the early divorce proceedings were underway. Tardif makes no developed argument as to why we must treat Giguere's counterclaim as if it is the equivalent of the hypothetical consent order in Nicolson regarding final custody. Indeed, in Giguere's counterclaim, he asked that the children be removed to Canada.[12] In his subsequent filing, he sought temporary joint custody with Tardif. Tardif therefore has failed to show that Giguere's counterclaim contesting Tardif's divorce and seeking custody establishes acquiescence under Nicolson or on any other basis.

Giguere contends that "[a]s soon as he found appropriate counsel, [he] filed a petition pursuant to the Convention and sought a stay of the custody portion of the divorce action . . . so that custody can be determined by a [c]ourt in [the children's] habitual residence." In this appeal, Tardif does not meaningfully

[12] In his counterclaim, Giguere asked the Massachusetts court to grant him custody of the children and "[a]llow [him] . . . to remove . . . the children to Quebec." The next day, he filed a motion for temporary orders, requesting joint custody of the children.

reckon with Giguere's consistent efforts to both preserve his parental rights and seek removal of the children to Canada.[13]

Moreover, the district court also noted that Giguere "had limited options to see his [c]hildren" during this period, Giguère, 2025 WL 2452168, at *17, and found that Tardif had control over the children's passports and had changed the locks to the Massachusetts residence, id. Giguere's filings in the Massachusetts courts thus must be viewed in light of his inability to obtain consensual access to his children during the pendency of the custody proceedings. Under circumstances involving unequal bargaining power between parents, we have not found a sufficient showing of acquiescence. See Darín, 746 F.3d at 17-19.[14] So too here.

[13] Tardif cites Larbie v. Larbie, 690 F.3d 295, 298 (5th Cir. 2012), to support her contention that Giguere acquiesced to her retention of the children by responding in state court to her divorce petition and filing a counterclaim in that action. However, in Larbie, the non-retaining parent engaged in multiple years of litigation to acquire custody in Texas state court, "specified that no other court had jurisdiction over" the child in her counterclaim, and only applied for Convention relief almost a year after the parents' divorce was finalized. Id. at 298-309 (underscoring that "the only thing in the record suggesting that [the petitioner] disagreed with the Texas court's authority" was her Hague petition). The decision in Larbie is thus plainly inapposite to the facts before us.

[14] In Darín, we credited the non-retaining parent's unequal bargaining power in our acquiescence analysis where he had no choice but to leave his son in the care of the retaining parent because his travel visa was expiring. See 746 F.3d at 17.

In sum, we conclude that the district court's factual finding that Giguere did not acquiesce to Tardif's retention of the children in Massachusetts was not clearly erroneous. Giguère, 2025 WL 2452168, at *18.

**III.**

For the reasons stated, we affirm the judgment of the district court.

So ordered.

**- Concurring Opinion Follows -**

**LIPEZ, Circuit Judge, concurring.** As we note in the panel opinion, Tardif does not develop any argument based on the "waiver of Hague Convention rights" language of Nicolson. There is scant law on the concept of "waiver of Hague Convention rights." And we do not need to address the waiver issue to resolve this appeal. These circumstances amply justify the panel's decision to avoid any definitive statement about the waiver issue.

Still, with an eye on the future development of the law on the waiver of Hague Convention rights, and its relationship to the Treaty's concept of "acquiescence," I think it is useful to clarify here Nicolson's statement that "a clear and formal consent order by the non-U.S. parent agreeing to let a state court decide final custody" could be treated either as acquiescence or "alternatively, [as] a waiver of Hague Convention rights." Nicolson, 605 F.3d at 107 (emphasis omitted). When the non-retaining parent "agree[s] to let a state court decide final custody," id. -- regardless of outcome -- it is in my view more appropriate to refer to that agreement as a waiver of Hague Convention rights rather than as the defense of acquiescence within the meaning of the Convention.[15] That is so because such an

[15] By contrast, when the non-retaining parent agrees to a state court's final order granting custody to the retaining parent, that agreement would properly be characterized as acquiescence. See Nicolson, 605 F.3d 106 ("[I]t is hard to think of a more formal acquiescence than entering into a consent order providing that the other parent be awarded custody." (emphasis omitted)).

agreement does not "acquiesce" to the removal and retention of the children; it allows the state court to make the custody determination. Although the Hague Convention takes precedence over state court proceedings,[16] once a non-retaining parent has clearly and unequivocally agreed to let a state court resolve final custody, that agreement is in effect a willingness to forgo -- or waive -- their rights under the Hague Convention.

Moreover, in the wake of such an agreement, it would defeat the Hague Convention's policy to "deter parents from

[16] The Hague Convention explicitly supersedes state court proceedings by barring local courts from "decid[ing] on the merits of rights of custody" once they have received notice of a wrongful removal or retention, Hague Convention, art. 16, T.I.A.S. No. 11670, and allowing return even in cases where there is a court order awarding custody to the alleged wrongdoer, id. art. 17. This policy is articulated in the Department of State's analysis of the Hague Convention:

> Children who otherwise fall within the scope of the Convention are not automatically removed from its protections by virtue of a judicial decision awarding custody to the alleged wrongdoer. This is true whether the decision as to custody was made, or is entitled to recognition, in the State to which the child has been taken. Under Article 17 that State cannot refuse to return a child solely on the basis of a court order awarding custody to the alleged wrongdoer made by one of its own courts or by the courts of another country. This provision is intended to ensure, inter alia, that the Convention takes precedence over decrees made in favor of abductors before the court had notice of the wrongful removal or retention.

51 Fed. Reg. at 10504.

engaging in . . . forum shopping," Karkkainen, 445 F.3d at 287, if, after significant participation in the state court proceedings, the non-retaining parent could subsequently withdraw that waiver of rights in an attempt to acquire a more favorable result in a different jurisdiction.[17] I emphasize, however, that participation in proceedings to determine temporary custody while litigation under the Hague Convention proceeds does not amount to waiver. Rather, a waiver of Hague Convention rights would occur if the petitioner has clearly and unequivocally agreed to defer to a state court resolution of final custody, effectively submitting to that court's exclusive jurisdiction, regardless of the outcome.

Arguably, a non-retaining parent who agrees to allow a state court to resolve a custody dispute is potentially "acquiescing" to the other parent's retention because such an outcome is possible in the state court proceedings. I nonetheless

[17] Such a change of course was a critical concern in Larbie, 690 F.3d at 298, where the Fifth Circuit concluded that the non-retaining parent had agreed to the Texas court's final resolution of the parents' custody dispute by filing an answer and counterclaim in Texas state court that "disavowed . . . the continuing jurisdiction of any other court" in a divorce action. Id. at 302 (citation modified). The court noted that any other conclusion would "undermin[e] the Convention's ability 'to deter parents from engaging in international forum shopping in custody cases.'" Id. at 310 (quoting Baxter, 423 F.3d at 367); see also id. at 309 n.15 (stating that petitioner "arguably waived any argument that the Texas court was an inappropriate forum to adjudicate the child custody issue by filing a counterpetition" and that "[i]n doing so, she did more than simply answer in order to avoid default; she affirmatively invoked the protection of the Texas court and its authority to provide her relief").

think it helpful, as a matter of conceptual clarity in the application of the Hague Convention, to recognize the distinction between the Hague Convention's defense of acquiescence -- in which the non-retaining parent is agreeing, by formal order or other "clear and unequivocal" proof, see Darín, 746 F.3d at 17, that the other parent may retain custody -- and a waiver of Hague Convention rights -- in which the non-retaining parent, the Hague Convention petitioner, gives up the right to have jurisdiction for custody proceedings determined under the Hague Convention.

I hope that this analytical distinction, unacknowledged by our decision in Nicolson, will be helpful to parties and courts dealing with Hague Convention petitions in the future.